Filed 2/26/15  In re R.F. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re R.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>R.F.,<br><br>　　　　Defendant and Appellant. | A140700<br><br>(Solano County<br>Super. Ct. No. J41554) |

**I.**

**INTRODUCTION**

In this juvenile wardship case, 15-year-old R.F. appeals a dispositional order committing her to an out-of-home placement in a group home.  R.F. contends that: (1) her case should have been transferred to the dependency court; (2) there is insufficient evidence to support findings that she violated probation, and (3) the juvenile court abused its discretion by ordering the group home placement.  We affirm.

1

## STATEMENT OF FACTS

### A. Background

In August 2012, R.F. was adjudged a ward of the juvenile court pursuant to Welfare and Institutions Code section 602,[1] after she admitted a misdemeanor commercial burglary in exchange for dismissal of other theft related charges. By that time, then 12-year-old R.F. had already accrued eight referrals to the county probation department and her guardian, great-grandmother Betty, had reported significant behavior problems. The juvenile court placed R.F. in an electronic monitoring program (EMP) and released her to Betty's custody.[2]

In September 2012, R.F. was charged with two probation violations: (1) failure to comply with EMP; and (2) receiving a school suspension after attempting to take a cell phone from a developmentally disabled adult special education student. R.F. admitted the EMP violation in exchange for dismissal of the other allegation. The juvenile court continued the wardship and probation, ordered R.F. to attend a counseling program and committed her to juvenile hall for five weekends.

In October 2012, R.F. was charged with violating probation by leaving home without her guardian's permission. Betty reported that R.F. took her debit card, withdrew $300, disappeared over night, and returned the following day but disappeared again. R.F. failed to appear at the probation violation hearing, and an arrest warrant was issued. Later that month, R.F. was arrested and the district attorney filed a new wardship petition charging her with grand theft. In November, R.F. admitted the grand theft charge in exchange for dismissal of the probation violation allegation. The juvenile court

---

[1] Unless otherwise stated, undesignated statutory references are to the Welfare and Institutions Code.

[2] R.F. had lived with Betty since she was three months old. Her mother, who was unable to care for her children because of substance abuse problems, was murdered when R.F. was six. R.F. reported that she had limited contact with her father who was not a "nice" person and engaged in criminal activities.

continued the dependency, ordered R.F. to attend "WRAP" counseling, and to spend an additional five weekends in juvenile hall.

In December 2012 and January 2013, R.F. was charged with additional probation violations for failing to comply with court-ordered curfew, staying out all night without permission and failing to attend school. R.F. admitted some probation violations in exchange for dismissal of others, and, in February 2013, the court escalated services to address R.F.'s mounting problems. In addition to EMP monitoring and curfew restrictions, R.F. was ordered to participate in therapeutic behavioral services, to attend a girls' group program, and to spend three additional weekends in juvenile hall.

In May 2013, the district attorney filed a new section 602 petition. According to the probation department report, R.F. cut off her EMP ankle bracelet on May 3, and was arrested for stealing a man's cell phone on May 5. The probation department also reported significant concern for R.F.'s safety. She left home and stayed out all night; she associated with adults who exploited and took advantage of her; older friends often asked her to steal things for them; she was involved in a sexual relationship with a 16-year-old male, and at one point, she mistakenly believed she was pregnant. These problems arose or persisted despite the fact that R.F. was "receiving the most intensive community based treatment services that Probation and Solano County ha[d] to offer."

On May 29, 2013, the court conducted a contested hearing and sustained the allegation that R.F. received stolen property. On June 12, R.F. was removed from Betty's custody and placed at a residential program called New Foundations. Her commitment had to be extended after she snuck out of Betty's home while on a furlough visit. On October 22, R.F. was released from the program and returned to Betty's care.

**B. The November 2013 Probation Violations**

On November 5, 2013, R.F. was charged with violating probation by failing to abide by court-ordered curfew. According to a supplemental probation department report, on November 4, Betty told the probation officer that R.F. left home on October 31 and did not return until November 2. At that point, Betty and R.F.'s brother "physically restrained" R.F. to keep her home. The police came and spoke to R.F., but the following

3

day she left again and did not return home. On November 4, the probation officer contacted R.F. at her school and spoke with her over the telephone. R.F. stated that she had an argument with Betty on October 31 so she spent the night at a friend's house. When she returned home, Betty restrained her and duct-taped her to a chair. After she was "set free," R.F. returned to her friend's home. R.F. said she did not feel safe at home but that she did not want to be taken back into custody. A report was filed with child protective services and the probation department requested that R.F. be detained until a decision could be made about how to proceed.

At the November 5 violation hearing, R.F. denied the allegation that she violated probation by failing to comply with her curfew order. The juvenile court continued the matter for a contest, and released R.F to Betty's custody under the EMP program. Three days later, R.F. was charged with another probation violation for failing to abide by her EMP contract. According to the probation department report, R.F. did not go to school on November 6. She left home early in the morning and her whereabouts were unknown until she returned a few hours later with a friend. When the friend refused to leave, Betty called the police who spoke to R.F. about respecting Betty's home. On November 7, R.F.'s conditional release officer went to her school to speak with her. The officer was informed that R.F. had not been at school since November 4. Betty told the probation officer she was very concerned about R.F.'s safety and stated that she did not feel she could control her granddaughter.

At the November 8 violation hearing, R.F. denied the most recent probation violation allegation and the matter was continued for a contest. In addition, the juvenile court ordered a referral to the probation department for preparation of a section 241.1 report addressing whether R.F.'s case should be transferred to the dependency court or remain in the delinquency court.

## C. The Jurisdiction Hearing

On the morning of December 4, 2013, the court held a jurisdiction hearing to determine whether R.F.'s case should be transferred to the dependency court in light of concerns that Betty could no longer properly care for R.F.

4

The probation department and the department of social services filed an "Agreed Joint Assessment Report" which recommended that "it is in the best interests of the minor and her family to be afforded services solely via the Probation Department . . . ." According to the report, the allegations of abuse and/or neglect were not sustainable, and R.F. did not qualify for child welfare services, but she and her family could benefit from services available in the delinquency court. Furthermore, the agencies jointly recommended that R.F. be placed in a group home. That recommendation was based on several factors including R.F.'s history of running away; her noncompliance with court orders; her high risk for reoffense; and the lack of supervision and structure at Betty's home. In addition, less restrictive efforts to assist R.F. had not been successful. She had already received intensive services and completed a placement at the New Foundations program, but only two weeks after her release from that program, R.F. admitted that she had contracted a sexually transmitted disease from "a pimp."

The juvenile court followed the joint recommendation to maintain R.F.'s case as a delinquency matter, providing this explanation for its decision: "The summary of the minor's behavior is such that I have grave concerns for the minor's safety. I think she's putting her life at risk in the behavior she's engaging in. . . . [¶] And I just don't think this is an appropriate case to be handled in the dependency court but rather should remain in the delinquency court because of the significant risk and the greater services, in my opinion, that will be available to helping this minor turn her life around and survive past the age of 20, which is about what I would put her life expectancy at if she continues doing what she is doing. [¶] Her lifestyle, as reflected in this report, is extremely dangerous to her own well-being, so I'm going to keep this matter in the delinquency court."

### D. The Contested Probation Violation Hearing

On the afternoon of December 4, 2013, the court conducted a contested hearing on the two probation violation matters.

Betty testified that a court-ordered curfew of 4:00 p.m. was also Betty's rule and that R.F. violated that rule on Halloween by leaving home that evening and staying out

all night. Betty's memory of the events was vague but she recalled that some time after R.F. returned, Betty "restrained" her and then called the police so they could "witness" what she had done and why she did it—because she did not want R.F. to leave again. After the police left, Betty let R.F. go because Betty was tired and needed to rest. A few days later, Betty thought R.F. was gone again and called the police who searched the house and found R.F. in the garage. Betty also recalled an occasion during that time frame when R.F. did not go to school. Betty subsequently learned that R.F. had gone to "get medical attention," which upset Betty, who believes that "medical people" should have to notify the parents before treating a child.

Nadia Hollomon, R.F.'s probation officer, testified that she met with R.F. after she was released from New Foundations to discuss her obligations and the court orders she was required to follow. They discussed her curfew, which required her to be home by 4:00 p.m. on weekdays and 6:00 p.m. on weekends. Hollomon also testified that she called R.F. on November 4, 2013, to follow up on Betty's report that R.F. violated her curfew. R.F. told Hollomon that she and Betty had an argument after Betty found out that R.F. had contracted a sexually transmitted disease. R.F. left the house and did not return for a few days.

Probation officer Phillip McLaughlin testified that his responsibilities include releasing minors from juvenile hall on home supervision or electronic monitoring. McLaughlin testified that R.F. signed an EMP contract pursuant to which she agreed to remain at home at all times except for school or medical, probation and attorney appointments. The contract also contained a provision requiring R.F. to attend school as required by law and school regulations. On November 7, 2013, McLaughlin went to R.F.'s school to conduct a school visit but she was not there. A school official checked the records and told McLaughlin that R.F. had not come to school that day or the day before.

At the conclusion of the hearing, the juvenile court sustained the allegation that R.F. violated probation by failing to comply with the curfew order and it also conditionally sustained the allegation that she violated her EMP contract by failing to

6

attend school. However, the court stated that it would reverse the second finding if R.F. produced verification that she missed school in order to attend a medical appointment. The matter was continued for disposition and to give R.F. time to produce verification of her medical appointment.

### E. The Contested Disposition Hearing

At a December 13, 2013, hearing, R.F. did not produce evidence of a valid excuse for failing to attend school but she did elicit testimony to support her objection to the probation department's recommendation to place her in a group home.

Betty testified she thought the group home recommendation was "ludicrous." She explained that R.F. was her child; she had raised her since she was three weeks old; she was as capable as any two parents; and she had raised nine children in her 79 years. Betty believed that R.F. needed "mental health," which had never been provided. She agreed to accept help for R.F., but testified that she wanted R.F. to remain in her home. Furthermore, she explained that she did not have a car and it would be difficult for her to visit if R.F. was placed outside the county.

Nadia Hollomon testified there were services that could be provided to R.F. if she remained in Betty's home, many of which R.F. had received prior to her placement at New Foundations. Hollomon also confirmed that both Betty and R.F. had expressed an interest in obtaining those services again. However, other considerations led the probation department to recommend a group home placement instead. Almost immediately after R.F. was released from New Foundations she was back in the streets because "[t]he supervision is just not there in her home." Furthermore, a group home could provide R.F. with mental health services which would give her tools for making better decisions after she was returned to Betty's care. Hollomon testified that she had found a placement for R.F. at the "Children's Home," a behavior program in Stockton. The program has six female residents. There is an on-site clinical social worker, weekly meetings with a psychologist, and a psychiatrist who conducts monthly evaluations. The program has an on-site school, includes proactive social activities for self-esteem, and takes the girls on field trips.

7

At the conclusion of the disposition hearing, the court removed R.F. from Betty's custody for placement in suitable foster home or institution. The maximum period of confinement was one year six months. R.F. was placed at the Children's Home of Stockton on December 23, 2013.

## III.

## DISCUSSION

### A.  Jurisdictional Issues

"A child who has been abused or neglected falls within the juvenile court's protective jurisdiction under section 300 as a 'dependent' child of the court.  In contrast, a juvenile court may take jurisdiction over a minor as a 'ward' of the court under section 602 when the child engages in criminal behavior.  [Citations.]  As a general rule, a child who qualifies as both a dependent and a ward of the juvenile court cannot be both.  [Citations.]"  (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1505.)

"In section 241.1 the Legislature has set forth a procedure for handling cases with potential dual jurisdiction.  First, the probation department and the welfare department of the county must assess the minor, pursuant to a jointly developed written protocol, to determine 'which status will serve the best interests of the minor and the protection of society.'  Then the recommendations of both departments must be presented to the juvenile court for its determination of the status appropriate for the minor.  [Citation.]"  (*In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1012-1013, fn. omitted.)

"We review the juvenile court's determination under section 241.1 for abuse of discretion.  [Citation.]  'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.'  [Citation.]  Throughout our analysis, we will not lightly substitute our decision for that rendered by the juvenile court.  Rather, we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them.  [Citation.]"  (*In re M.V.*, *supra*, 225 Cal.App.4th at pp. 1506-1507.)

8

In the present case, R.F. contends that the juvenile court abused its discretion by refusing to transfer her case to the dependency court because its decision was based on a deficient section 241.1 assessment report.

"The assessment of a minor under section 241.1 is statutorily required to include, at a minimum, consideration of the following eight factors: (1) the nature of the referral; (2) the age of the minor; (3) the prior record of the minor's parents for child abuse; (4) the prior record of the minor for out-of-control or delinquent behavior; (5) the parents' cooperation with the minor's school; (6) the minor's functioning at school; (7) the nature of the minor's home environment; and (8) the records of other agencies that have been involved with the minor and his or her family. [Citation.] This statutory mandate has been augmented by [California Rule of Court] rule 5.512, which requires the joint assessment under section 241.1 to be memorialized in a written report. Further—in addition to the eight factors set forth in section 241.1 that must be considered in any such joint assessment—rule 5.512 demands evaluation of four additional items: (1) the history of any physical, sexual, or emotional abuse of the child; (2) any services or community agencies available to assist the child and his or her family; (3) a statement by any counsel currently representing the minor; and (4) a statement by any court appointed special advocate (CASA) currently appointed for the child. [Citation.]" (*In re M.V.*, *supra*, 225 Cal.App.4th at p. 1506.)

Here, R.F. argues that her section 241.1 assessment report failed to adequately address three matters required by the statute and/or court rule: (1) the nature of the referral; (2) the age of the minor; and (3) any services or community agencies available to assist the child and her family. (§ 241.1, subd. (b)(2); California Rules of Court, rule 5.512(d)(10).) However, our review of the detailed and comprehensive 24-page report confirms that all three of these matters were adequately addressed.

First, the report provided detailed information about the nature of the referral, i.e., the two probation violation allegations that simultaneously raised concerns about Betty's ability to care for R.F. It summarized the evidence supporting conclusions by the social services agency that the neglect/abuse referrals would likely not be sustained because

9

they were either inconclusive or not supported by sufficient evidence. Notably, that evidence included interviews with the involved parties including R.F. who told the social worker that the reason Betty and R.F.'s brother duct-taped her to a chair was because they were scared and upset that she had contracted a sexually transmitted disease "from being out in the streets." R.F. also acknowledged that she was not injured by the incident and, indeed, it had no real effect on her at all. She denied that she kept running away, taking the position that she was only leaving home without permission. Furthermore, R.F. insisted that she wanted to return to Betty's home, and that Betty could adequately control her and take care of her.

The report also addressed the circumstances that gave rise to the two probation violation allegations, compiled the substantive evidence supporting the joint recommendation for a group home placement and explained why that placement would best address R.F.'s needs: "A group home placement will allow [R.F.] to address treatment issues in a safe, structured living environment. The minor's psychological, educational, medical and behavioral needs will be met while in placement. She will also receive counseling to address her exploitive behaviors, lack of self-esteem, and poor response to parental supervision. It is hopeful that placement will give the minor tools to assist her in better decision making, and reunify with her great-grandmother."

Second, the section 241.1 assessment addressed the implications of R.F.'s age. For example, the report states "Before the Court is a *thirteen* year old minor who has developed a significant pattern of noncompliance. She has a history of running away from home and engaging in risky behaviors. Her young age and naivety make the minor's welfare of great concern." (Original bolded italics.)

Third, the section 241.1 assessment summarized services that had been provided to R.F. and addressed what services were potentially available to her in the future. As reflected in our factual summary, the agencies were concerned that R.F. would not qualify for any services if the case was transferred to dependency court. More fundamentally, as just discussed, the recommendation to retain R.F.'s case in dependency

court was explicitly tied to the nature of services that would be available to her in a group home placement.

R.F. argues that the section 241.1 assessment was fatally inadequate because it failed to: (1) mention that R.F. was not receiving counseling or support services during the two-week period after her release from New Foundations, and (2) consider whether the absence of those services may have "helped create the possibility that R.F. would quickly violate the terms of her probation." She contends that this information was crucially relevant because if it had been included in the report, the court would have realized that "[a]t most, this entire episode speaks to R.F.'s deep need for therapy and structured programs and not to a need for increased punishment or discipline." We reject this argument for several, separate reasons.

First, the report as written was neither inaccurate nor misleading; it accurately summarized the services provided to R.F. throughout the wardship proceeding and never suggested that she was in counseling during the two weeks after she was released from New Foundations. Second, R.F.'s assertion that she would not have violated probation if she had had been receiving counseling during that brief period is speculation, not supported by affirmative evidence and arguably inconsistent with her demonstrated pattern of behavior. Third, R.F.'s characterization of the choice a court must make under section 241.1 reflects a fundamental misunderstanding of the purpose of delinquency proceedings. "Under section 202, juvenile proceedings are primarily "rehabilitative" (*id.*, subd. (b)), and punishment in the form of "retribution" is disallowed (*id.*, subd. (e))." (*In re Eddie M*. (2003) 31 Cal.4th 480, 507.) Thus, contrary to the premise of R.F.'s claim of error, the decision to keep her case in the delinquency court was not motivated by a desire to punish her. In fact, it appears to us that everyone agreed R.F. needed therapy and structured programs, and that the dispositive question before the court was which forum could best provide those services going forward.

Taking a different tack, R.F. argues that, regardless of the adequacy of the section 241.1 assessment report, the juvenile court abused its discretion by failing to explicitly address the factors that R.F. has identified as dispositive in her case, namely the nature of

11

the referral, her tender age, and the services that had not been provided after she was released from New Foundations. First, R.F. fails to identify statutory or case authority requiring a juvenile court to make explicit findings with respect to each or any factor addressed in a section 241.1 assessment. Second, as our factual summary reflects, at the jurisdiction hearing in this case, the court provided a detailed and case specific explanation for its ruling, which confirms that it considered the relevant factors and reached a reasoned decision that was neither arbitrary nor capricious.

In summary, the section 241.1 assessment report was adequate and substantially supports the court's determination that the delinquency court was a better forum for addressing R.F.'s increasingly dangerous behavior. Indeed, the agencies questioned whether R.F. would even qualify for child dependency services. Thus, the juvenile court did not abuse its discretion by continuing R.F.'s case as a delinquency matter.

## B. The Probation Violations

Probation violation proceedings conducted pursuant to section 777 require a preponderance of the evidence to support the violation. (§ 777; *In re Eddie M.*, *supra*, 31 Cal.4th at p. 501.) Here, the record shows that both probation violations were proven by a preponderance of the evidence.

The probation violation for violating curfew was established by testimony from Betty and Nadia Hollomon and was not disputed by any evidence. Betty testified that R.F. violated curfew on October 31, 2013, by leaving her home after returning from school and staying out all night. Nadia Hollomon confirmed that Betty had reported that R.F. went out at night and did not return home. Hollomon also testified that R.F. admitted to her that she left Betty's home and spent more than one night at a friend's house.

The EMP violation was established by testimony from Betty and Phillip McLaughlin. Betty testified that R.F. did not go to school on at least one day after she was released from New Foundations. McLaughlin also testified that R.F. did not go to school on November 7, 2013.

12

On appeal, R.F. contends the juvenile court committed reversible error by admitting McLaughlin's testimony because it was inadmissible hearsay. When her trial counsel raised this objection at the probation violation hearing, the court asked McLaughlin how he knew R.F. was not at school. McLaughlin testified that "I went to the attendance office. They checked the computers. She was not at school that day or the previous day." R.F.'s counsel objected again, arguing the county was required to bring in the custodian of records from the school. After McLaughlin confirmed that he got his information from a school official, the court overruled R.F.'s objection, stating: "In probation violation hearings, the Court can rely on reliable hearsay, and I think information from a school official relating to whether or not someone is at school is sufficient to overcome the hearsay objection."

The legal premise of the juvenile court's ruling was sound. "Although probation violation hearings involve the criminal justice system, they are not governed by all the procedural safeguards of a criminal trial. [Citations.] Specifically the Sixth Amendment's right of confrontation does not apply to probation violation hearings. [Citation.] A defendant's right to cross-examine and confront witnesses at a violation hearing stems, rather, from the due process clause of the Fourteenth Amendment. [Citation.] Those confrontation rights, however, are not absolute . . . .' [Citation.]" (*People v. Abrams* (2007) 158 Cal.App.4th 396, 400.)

Juvenile probation revocation proceedings are governed by section 777 which states that a court "may admit and consider reliable hearsay evidence at the hearing to the same extent that such evidence would be admissible in an adult probation revocation hearing, pursuant to the decision in *People v. Brown* [1989] 215 Cal.App.3d [452] and any other provision of law." (§ 777, subd. (c).) In *People v. Brown, supra*, 215 Cal.App.3d 452 (*Brown*), the Court of Appeal rejected a contention that appellant's due process rights were violated at a probation revocation hearing because a police officer was permitted to testify regarding the results of a lab test establishing that evidence seized from the defendant was cocaine. (*Id*. at pp. 454-455.) The *Brown* court held "[a]s long as hearsay testimony bears a substantial degree of trustworthiness it may

13

legitimately be used at a probation revocation proceeding. [Citations.] In general, the court will find hearsay evidence trustworthy when there are sufficient 'indicia of reliability.' [Citation.] Such a determination rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. [Citation.]" (*Ibid*.)

Section 777 and *Brown* support the juvenile court's decision to permit the probation officer to testify that a school official looked at the school attendance records and then told him that R.F. had not been at school for two days. School officials have a mandatory duty to keep attendance records and an incentive to keep accurate records in order to ensure adequate state funding. (Ed. Code §§ 1244, 41020, subd. (c), 42127, 44809, subd (b), 46000, 46300.) In light of this indicia of reliability, the court did not abuse its discretion by concluding that the hearsay statement by a school official was sufficiently trustworthy to be used at the probation violation proceeding.

On appeal, R.F. contends the school official's hearsay statement was not admissible under *Brown* or otherwise reliable because it was "testimonial" hearsay, used as substantive proof of the probation violation, and thus could not be properly admitted absent a showing of good cause for replacing live testimony about the matter. To support this argument, R.F. relies on *People v. Arreola* (1994) 7 Cal.4th 1144 (*Arreola*), and *In re Kentron D*. (2002) 101 Cal.App.4th 1381.)

*Arreola*, *supra*, 7 Cal.4th 1144, was an appeal from an order revoking the defendant's probation for driving while intoxicated. At the revocation hearing the trial court admitted evidence of a police officer's preliminary hearing testimony given in a new criminal case arising out of the same incident without requiring a showing of good cause for not eliciting live testimony from the officer. (*Id*. at pp. 1156-1157.) The *Arreola* court affirmed the rule that many forms of documentary hearsay evidence are by their nature sufficiently "trustworthy to be relied upon by the trial court in revoking probation." (*Id*. at p. 1156.) However, the court also found that the admission of preliminary hearing testimony in lieu of live testimony required a more rigorous showing of good cause.

14

The *Arreola* court explained that "[t]here is an evident distinction between a transcript of former live testimony and the type of traditional 'documentary' evidence . . . that does not have, as its source, live testimony. [Citation.]" (*Arreola, supra*, 7 Cal.4th at p. 1157, italics omitted.) Witness demeanor is usually not a "significant factor" when evaluating the reliability of documentary hearsay where the purpose of foundational testimony is often simply to authenticate the documentary material, and where the missing witness would likely "be unable to recall from actual memory information relating to the specific contents of the writing and would rely instead upon the record of his or her own action." (*Id*. at p. 1157.) However, there is a "particularly important" need for confrontation where the evidence is testimonial "because of the opportunity for observation of the witness's demeanor." (*Ibid*) In light this distinction, the *Arreola* court held that a showing of good cause is required "before a defendant's right of confrontation at a probation revocation hearing can be dispensed with by the admission of a preliminary hearing transcript in lieu of live testimony." (*Id.* at p. 1159.)

The good cause requirement articulated in *Arreola* is a "broad standard" which is met "(1) when the declarant is 'unavailable' under the traditional hearsay standard (see Evid. Code, § 240), (2) when the declarant, although not legally unavailable, can be brought to the hearing only through great difficulty or expense, or (3) when the declarant's presence would pose a risk of harm (including, in appropriate circumstances, mental or emotional harm) to the declarant. [Citation.]" (*Arreola*, *supra*, 7 Cal.4th at p. 1160.) Furthermore, the ultimate determination of admissibility must be made on a case-by-case basis and requires consideration of other relevant circumstances including the purpose for which the evidence is offered, the significance of the particular evidence, and whether other admissible evidence corroborates the hearsay evidence or if it is the only evidence establishing the probation violation. (*Ibid*.) This good cause requirement was applied in a juvenile probation matter in *Kentron*, *supra*, 101 Cal.App.4th 1381.

*Kentron* was an appeal from a disposition order placing a ward of the juvenile court in a camp community program based on findings that he violated several conditions of his probation. (101 Cal.App.4th 1381.) Applying the principles summarized in

15

*Arreola*, *supra*, the *Kentron* court found that the juvenile court abused its discretion by admitting hearsay statements in the probation department's section 777 notice of the alleged violations. (*Id.* at pp. 1392-1393.) The section 777 notice was an "accusatory pleading" prepared by a probation officer for the sole purpose of instituting a judicial proceeding and the prosecutor did not establish any foundation for admitting it as evidence. (*Id.* at p. 1393.) Two of the violations alleged in the notice were witnessed by probation officers who were not present in court, and there had been no showing these witnesses were unavailable. The other alleged violations were based on observations by probation officers who were present in court and presumably available to testify, and yet the prosecutor chose not to call them as witnesses. Under these circumstances, the juvenile court committed reversible error by relying solely on the hearsay allegations in the section 777 notice as substantive proof that the violations were committed. (*Kentron*, *supra*, at pp. 1392-1393.)

For several reasons, *Arreola* and *Kentron* do not require reversal of the probation violation order in this case. First, we are not convinced that McLaughlin's testimony fits the definition of testimonial hearsay addressed by these cases. Technically, McLaughlin was repeating a statement made to him by the school official. However, the school official's statement was itself documentary hearsay, since it was based entirely on the content of official computerized school records. That official's demeanor as a witness was not a significant factor in evaluating foundational testimony relating to the admission records. It appears that the only purpose achieved by mandating the appearance of the school official would be to authenticate documentary material which the juvenile court could reasonably have concluded was unnecessary in light of the indicia of reliability associated with those records.

Second, even if the court erred by permitting McLaughlin to testify that R.F. did not attend school on November 7, that was only one aspect of the probation officer's testimony. McLaughlin also testified that he went to R.F.'s school on that date and did not find her there. That non-hearsay testimony reinforced Betty's testimony that R.F. did not go to school on at least one day during the relevant time period. Thus, there was

16

substantial evidence of the EMP violation even without consideration of the reliable hearsay evidence establishing that school records showed R.F. had not been to school in two days.

Finally, as discussed above, the record also establishes that R.F. committed a separate probation violation by failing to comply with the court's curfew order. The only ground upon which R.F. challenges that separate finding is that Betty admitted that, on a different occasion she mistakenly believed that R.F. had gone out when she was only hiding in the basement. Betty's testimony about a collateral incident which was not charged as a probation violation does not dilute the undisputed substantial evidence that R.F. violated her curfew on October 31.

### C. The Out of Home Placement

"A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion. [Citation.] ' "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." ' [Citation.]" (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1330.)

In the present case, the juvenile court made numerous findings to support the out-of-home placement, including that (1) prior efforts to keep R.F. in Betty's home had failed; (2) the extensive services already provided to R.F. did not alter her problematic behavior; (3) R.F. resisted Betty's efforts to help her because the streets were more attractive to her than Betty's home; (4) R.F. repeatedly violated the terms of her probation; and (5) R.F. was engaging in a pattern of inappropriate and dangerous sexual behavior. All of these findings are supported by substantial evidence and they establish that the juvenile court did not abuse its discretion by ordering the out of home placement.

R.F. contends that "de minimus," "technical and non-criminal" probation violations do not justify removing a 13-year-old from her home. This argument fails to address the pertinent facts supporting the juvenile court's placement decision. R.F.'s two recent probation violations were not isolated occurrences, but part of a pattern of noncompliance. They were also evidence that the court and probation department had

17

made extensive efforts to rehabilitate R.F. without removing her from her home and that those efforts had failed. Furthermore, when viewed in proper context, the fact that R.F. was only 13 years old reinforced the juvenile court's conclusion that an out of home placement was necessary. R.F.'s immaturity combined with her other problems to make her uniquely vulnerable to exploitation and abuse by people from whom she refused to disassociate.

R.F. ignores substantial evidence that she did not utilize services afforded to her while in Betty's care; that she needed greater protection than Betty could provide; and that the intensive services afforded at the Children's Home would increase the likelihood that R.F. could successfully reunify with Betty in the future. Under these circumstances, the court did not abuse its discretion by ordering the out-of-home placement.

## IV.

## DISPOSITION

The juvenile court orders are affirmed.

_____
RUVOLO, P. J.


We concur:



_____
REARDON, J.



_____
BOLANOS, J.*




\* Judge of the San Francisco City and County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.